## APPEAL OF A. B. KIRSCHBAUM CO.

Docket No. 6165. Decided October 13, 1926.

Payment received in 1919 by a taxpayer under an agreement canceling a war-supply contract made between April 6, 1917, and November 11, 1918, is income attributable to a Government contract, within section 301 (c) (1) Revenue Act of 1918.

*James C. Peacock, Esq.*, and *C. E. Koss, Esq.*, for the petitioner.
*George G. Witter, Esq.*, for the Commissioner.

Proceeding to redetermine a deficiency of $32,489.64 income and profits tax for 1919. The error alleged is that the Commissioner

determined that an amount received by petitioner in 1919 was, under section 301 (c) of the Revenue Act of 1918, subject to tax proportionately at 1918 rates as income derived from Government contracts, whereas the petitioner contends that the amount was derived from subsequent "cancellation agreements" made in 1919 and taxable at 1919 rates.

### FINDINGS OF FACT.

The petitioner is a Pennsylvania corporation, engaged in the manufacture of clothing.

On November 11, 1918, there was an uncompleted contract between it and the United States Government, entered into April 25, 1918, for the manufacture of approximately 300,000 wool coats for use in connection with the war. For the manufacture of each coat the petitioner was to receive $1.75.

The quantities called for by this unfilled contract being in excess of the Government's requirements after the Armistice, the Government undertook negotiations for the termination of the contract and an adjustment agreeable to both parties.

On February 5, 1919, the petitioner and the United States Government entered into a so-called "cancellation agreement," relating to the original contract of April 25, 1918, the material provisions of which, for the purpose of this inquiry, are as follows:

WHEREAS the furnishing and delivery of further articles or work, under said original contract, would exceed the present requirements of the United States; and

WHEREAS it is in the public interest to terminate said original contracts as herein provided; and

WHEREAS the contractor, in pursuance of the original contract, has incurred expenses and obligations for the purpose of furnishing and delivering articles or work remaining undelivered under said original contract and is relinquishing prospective profits on the unexecuted portion thereof;

Now, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, it is agreed between the parties hereto as follows:

I. The contractor shall not furnish or deliver and the United States shall not accept or pay for any further articles or work agreed to be delivered under said original contract, to wit, 254,920 Wool Coats which are hereby cancelled; contractor to be paid at the rate of $.43 for each Coat so cancelled.

II. The United States shall pay forthwith to the contractor the sum of One Hundred Nine Thousand, Six Hundred Fifteen Dollars and Sixty Cents ($109,615.60), which sum, together with payment for the finished articles or work heretofore delivered to the United States and not yet paid for, shall constitute full and final compensation for articles or work delivered, services rendered, and expenditures incurred by the contractor under the original contract.

III. The contractor does hereby, for itself, its successors, heirs, legal representatives, and assigns, upon receipt of payment set forth in paragraph II supra, remise, release, and forever discharge the United States of and from all

and all manner of debts, dues, sum or sums of money, accounts, reckonings, claims, and demands whatsoever due or to become due in law or in equity under or by reason of or arising out of said original contract.

On August 27, 1919, an award was made to the petitioner by the Government which, referring to the original contract, recited in part as follows:

It appearing * * * that there have theretofore been delivered by the claimant and accepted by the United States under the said agreement 45,080 Wool Service Coats at $1.75 of the fair aggregate value of $78,890.00 that the said sum of $78,890.00 paid or to be paid for said articles or work heretofore delivered and accepted together with the additional sum of $109,615.60 will adjust, pay, and discharge such agreement upon a fair and equitable basis, and that such sum will not include prospective or possible profits on any part of the agreement beyond the goods and supplies delivered to and accepted by the United States thereunder and a reasonable remuneration for expenditures and obligations · or liabilities necessarily incurred in performing or preparing to perform said agreement:

The Secretary of War hereby awards to said claimant the sum of $109,615.60 which sum, in conjunction with the payments herein above mentioned, made or to be made for the articles, work or services heretofore delivered and accepted shall be in full adjustment, payment, and discharge of said agreement.

And further:

This award confirms settlement contract made with this claimant, dated February 5th and numbered 535 and is for the same amount and the same items, and payment of the amount of said settlement contract or of this award shall operate as full adjustment and discharge of the said agreement.

There were also six other subsisting contracts on November 11, 1918, made prior to that date and subsequent to April 6, 1917, between the petitioner and the United States Government, for the manufacture of large quantities of coats, trousers, bandoleers, and similar articles for use in connection with the war.

The quantities called for by these unfilled contracts were in excess of the Government's requirements after the Armistice. The Government undertook negotiations for the termination of the contracts and adjustments agreeable to both parties thereto. As a result of these negotiations cancellation agreements were entered into and awards were made to the petitioner. The pertinent portions of these cancellation agreements and of the award forms are the same as those quoted from the contract of April 25, 1918, except as to amounts, number and kind of articles, etc.

As a final result of these negotiations there were paid by the Government to the petitioner in 1919 the following amounts as awards under the settlement contracts: $109,615.60, $15,615.60, $10,454.23, $8,600.65, $1,229.23, $7,547.10, and $745.59, making a total of $153,808. The parties agree that the petitioner is entitled to

deductions from this gross amount which will leave a net income involved of $119,882.59.

OPINION.

STERNHAGEN : When on February 24, 1919, Congress passed the Revenue Act of 1918, the bill having originated in the House in the preceding September, before the Armistice, it was known to all that the Government had made many contracts for war supplies at war prices, that the Armistice had necessitated their abrogation, and that settlement of the Government's obligations must be fairly and promptly made. To this end the Dent Act was under consideration and was soon enacted on March 2, 1919. Since " the purpose of the high rates was, in effect, to confiscate so-called war profits and to prevent the making of extortionate profits from the war," *Walcott Lathe Co.*, 2 B. T. A. 1231, 1236, consistency required that war profits derived from the Government should be subjected to such high rates, even although by the delay of settlement they were not realized until 1919 after the war emergency was over. By section 301 there was imposed the profits tax at the higher rates for 1918 and the lower rates for 1919 and thereafter, " except corporations taxable under subdivision (c)." Subdivision (c) imposed a different tax for 1919 and thereafter " upon the net income of every corporation which derives in such year a net income of more than $10,000 from any Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive," and this tax was the sum of a proportionate tax at 1918 rates allocable to the income " attributable to such Government contract or contracts " and a proportionate tax at 1919 rates allocable to the income not so attributable. Thus the statute clearly taxes at this composite rate the corporation which " derives " net income from a Government contract made between the dates mentioned, and imposes the higher 1918 rates proportionately upon the income " attributable " to such contract.

The petitioner made seven such contracts which had not been fully performed at the time of the Armistice and by reason of which it was entitled to receive substantial profits. If these profits had been received either by way of performance or by way of liquidation directly, they would clearly have been attributable to the Government contracts and thus measured the tax at 1918 rates. Whether there was such a situation in respect of contracts of this petitioner other than the seven in question does not appear, and in the absence of a showing by petitioner to the contrary we must assume that the petitioner was within the class of corporations deriving income from Government contracts. The Commissioner has found petitioner to be in that class and the petitioner does not establish error in that

respect unless it proves a complete negative—that none of its income was so derived. Even if we were to hold with petitioner in its principal contention that the particular income in question was not attributable to the seven contracts made before November 11, 1918, and thus not subject to 1918 rates, it might still be true that, by reason of other income derived from Government contracts, the corporation would be subject to the composite rate of subdivision (c). We therefore hold, for lack of evidence to the contrary, that the petitioner was within the class of corporations taxable under subdivision (c).

The petitioner's principal concern, however, is to prove that the income in question is not within the portion of its income which goes to measure the 1918 rates; and hence, instead of proving literally, as it seeks to do, that this income was not " derived " from Government contracts,—a matter, as we have seen, which concerns only the question of whether a corporation is within the subdivision at all,—it must prove that the income in question is not subject to " the rates specified in subdivision (a)" because it is not "attributable to such Government contract or contracts." This it seeks to do by an argument that the so-called cancellation agreements were complete new contracts made after the Armistice and superseded the supply contracts, and that, since the amounts received were in fulfillment of the cancellation agreements, they can not be attributed to the statutory war contracts. It cites authority that the two contracts are separate and distinct and that disputes under a cancellation contract are determinable by reference to the new contract and not the one superseded.

The argument is in our opinion too superficial to dispose of the merits of the question. It leaves out of consideration the outstanding intendment of the statute to impose 1918 rates upon income from war contracts irrespective of the year of receipt, and imputes to the legislation a difference in tax measured by the adventitious circumstance of the time and form of settlement. It is not to be supposed that Congress would impose high taxes upon those who received settlement later under the Dent Act and low taxes on those who were fortunate enough to negotiate an early agreement of settlement.

Furthermore, we are of opinion that not only is the Commissioner acting within the intendment of the Act but also within its letter. The original contracts were alone the cause of petitioner's receipt of the income. Without them there would have been no settlement, no subsequent agreement, no award, or no payment. From them the Government derived some of its supplies and its obligation to compensate, and the petitioner derived its compensation both for

the supplies furnished and for the situation confronting it by reason of the Armistice. The cancellation agreement only expedited and regulated the settlement of this compensation. When it was received or accrued it was directly attributable to the Government contracts made before November 11, 1918.

> *Judgment will be entered for the Commissioner.*